**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| DIRECTV Incorporated,<br><br>                         Plaintiff,<br><br>v.<br><br>Eagle West Communications Incorporated, et al.,<br><br>                         Defendants. | No. CV-09-00379-PHX-JAT<br><br>**ORDER** |

Pending before the Court is Plaintiff DIRECTV, LLC's ("DIRECTV", formerly known as DIRECTV, Inc.) Motion for Award of Attorneys' Fees and Related Non-Taxable Expenses (Doc. 200). The Court now rules on the motion.

**I.    Background**

DIRECTV brought this civil action against Defendants, including Paul LaBarre and Terri LaBarre (collectively, the "LaBarres"), for "fraudulently obtaining DIRECTV's satellite television programming and distributing that programming over cable systems owned and operated by Defendants in Arizona and Nevada." (Doc. 1 at 2). In addition to this civil action, Defendants Paul LaBarre and Ernest McKay were the subject of a criminal investigation in which Paul LaBarre was ultimately sentenced and ordered to pay DIRECTV $157,395 in restitution. (Doc. 200-5 ¶ 7).

DIRECTV and the LaBarres entered into a settlement agreement (the "Settlement Agreement") because DIRECTV believed, based on the Defendants' representations, that Defendants had limited assets available. (*Id.* ¶ 9). Defendants specifically represented in

the Settlement Agreement that they "fully and completely disclosed to DIRECTV all assets with a fair market value in excess of $20,000, and have provided accurate appraisals and/or good faith estimates of the value of each asset disclosed by them." (*Id.* at 71). Defendants agreed to pay $400,000 in compensation to DIRECTV, and executed a consent judgment in this amount to be held by DIRECTV as security for Defendants' performance under the agreement. (*Id.* ¶¶ 10, 14). Defendants also agreed that upon any breach by them of the Settlement Agreement:

> DIRECTV shall be entitled to recover its actual expenses associated with the enforcement of this Settlement Agreement and/or the Permanent Injunction, including but not limited to reasonable attorneys' fees and recoverable costs incurred in connection with such enforcement, in addition to any other monetary or injunctive relief to which DIRECTV may be entitled.

(*Id.* at 78).

Defendants' first payment under the Settlement Agreement was due on September 24, 2009. (*Id.* at 67). Defendants failed to make this payment, and the Court subsequently entered judgment jointly and severally against Defendants for $400,000. (*Id.* ¶ 13; Doc. 99). DIRECTV then undertook extensive, multi-year efforts to collect from Defendants. (*Id.* ¶¶ 16-44). To date, Defendants have not yet satisfied the judgment in full. (Doc. 201-1 at 5).

In 2013, the LaBarres filed a voluntary bankruptcy petition. DIRECTV filed a Proof of Claim for the outstanding balance on the judgment plus attorneys' fees and costs incurred in enforcing the Settlement Agreement. Claim 11-1, *In re Paul D.H. La Barre and Terri Sue La Barre*, Ch. 13 Case No. 2:13-bk-17390-EPB (Bankr. D. Ariz. Feb. 14, 2014). The LaBarres objected to DIRECTV's claim, arguing that DIRECTV's attorneys' fees were unreasonable. Debtors Objection to the Proof of Claim Filed by DIRECTV, LLC, Claim 11-1, *In re Paul D.H. La Barre and Terri Sue La Barre*, Ch. 13 Case No. 2:13-bk-17390-EPB (Bankr. D. Ariz. Feb. 14, 2014). The Bankruptcy Court has stayed its proceedings pending a determination by this Court of the reasonableness of DIRECTV's claimed attorneys' fees.

## II. Legal Standard

### A. Reasonableness of Attorneys' Fees

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 430 (1983); *see also Schweiger v. China Doll Restaurant, Inc.*, 673 P.2d 927, 931-32 (Ariz. Ct. App. 1983). Accordingly, "fees in excess of the amount in dispute are not *per se* unreasonable." *Harris v. Reserve Life Ins. Co.*, 762 P.2d 1334, 1338 (Ariz. Ct. App. 1988); *see also Wagner v. Casteel*, 663 P.2d 1020, 1023 (Ariz. Ct. App. 1983). Rather, the question is whether "a reasonable and prudent lawyer" would have undertaken the claimed services "to advance or protect his client's interest in the pursuit" of a successful recovery of damages. *See Schweiger*, 673 P.2d at 932 (quoting *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1313 (9th Cir. 1982)).

### B. Local Rule 54.2

Local Rule of Civil Procedure ("Local Rule") 54.2 governs claims for attorneys' fees and related non-taxable expenses. LRCiv 54.2(a). A party moving for an award of fees must demonstrate both eligibility for fees and entitlement to the particular amount of fees requested. LRCiv 54.2(c)(1)-(2). Moving counsel must attest to, among other things, their qualifications, the reasonableness of the rate, and the reasonableness of the time spent. LRCiv 54.2(d)(4). Counsel must also attach to its motion "[a]ny other affidavits or evidentiary matter deemed appropriate under the circumstances or required by law." LRCiv 54.2(d)(5).

The party against whom fees are sought has the burden of specifically identifying those portions of the fee request to which it objects:

> The responsive memorandum of points and authorities in opposition to a motion for award of attorneys' fees and related non-taxable expenses shall identify with specificity all disputed issues of material fact and shall separately identify each and every disputed time entry or expense item. The respondent may attach controverting affidavits.

1  LRCiv 54.2(f); *see also Aviva USA Corp. v. Vazirani*, 2012 WL 2503962, at *3 (D. Ariz.
2  June 28, 2012) (rejecting the defendants' broad challenge to claimed fees and noting the
3  defendants' "burden to challenge fees with specificity").

**III.   Analysis**

### A.   Claimed Fees Exceeding the Underlying Debt

The LaBarres first assert that DIRECTV's fees claim is facially unreasonable because the amount claimed is "almost three times the amount of the actual underlying debt." (Doc. 201 at 3). The LaBarres accuse DIRECTV's counsel of "needlessly rack[ing] up unnecessary attorneys' fees, based on the assumption they would be able to recover those attorneys' fees from the LaBarres under the Settlement Agreement." (*Id.*)

The LaBarres do not cite, and the Court has not found, any authority for the proposition that a fees-to-debt ratio of 3:1 is facially unreasonable. The Arizona Court of Appeals has indicated that "fees in excess of the amount in dispute are not *per se* unreasonable." *Harris*, 762 P.2d at 1338. Rather, the question is whether a reasonable lawyer would have undertaken DIRECTV's collection efforts to protect DIRECTV's interests. *See Schweiger*, 673 P.2d at 932. Although at first glance the claimed fees appear to be significant in light of the debt owed, DIRECTV offers uncontroverted evidence detailing its collection efforts; this evidence shows that DIRECTV's attorneys' fees were necessary for DIRECTV to attempt to collect on the LaBarres' debt.

DIRECTV offers the declaration of its counsel, Scott T. Wilsdon, who testifies to the following facts regarding DIRECTV's collection efforts. The Court reproduces the following paragraphs from Wilsdon's declaration because they adequately summarize DIRECTV's collection efforts and explain how DIRECTV incurred such a substantial amount of attorneys' fees:

> On September 24, 2009, Defendants failed to make the first of several required payments to DIRECTV. Defendants offered conflicting and, at times, fantastic reasons for why they failed to make their initial payment to DIRECTV. Among the excuses made by Defendants were a purported failure of a deal to sell Defendants' cable systems to a rap music company and a purported failure to secure financing from an unnamed Libyan prince.

- 4 -

DIRECTV commenced collection shortly following Defendants' breach. Those efforts included filing a consent judgment in the amount of $400,000, which had been given to DIRECTV as security for Defendants' payment obligations. That judgment was entered in this action by the Honorable Mary H. Murguia, former Arizona District Court Judge (the "Judgment"). . . .

DIRECTV eventually received $150,000 from Defendant Ernest McKay, and that amount was credited against the Judgment owed by Defendants LaBarre, reducing the outstanding balance to $250,000, not including accrued interest under 28 U.S.C. § 1961.

### Collections from Defendants LaBarre

Collecting on the Judgment from Defendants LaBarre proved to be far more protracted. In late 2009, following the breach, Defendants LaBarre insisted that they would soon be able to pay DIRECTV by selling their business to a third party, which they identified as Superstition Funding. The supposed buyer sent what it purported was a $45 million loan commitment to complete the purchase. The loan documents received from Superstition Funding . . . appeared highly irregular and of doubtful legitimacy. The transaction went nowhere, and DIRECTV later learned that the owner of Superstition Funding, Dan Pero, was a business partner of Defendant Paul LaBarre.

In spring to summer 2010, DIRECTV, through its local counsel Snell & Wilmer L.L.P. ("Snell & Wilmer"), initiated proceedings to garnish several bank accounts that DIRECTV identified as held by Defendants LaBarre, or entities related to Defendants LaBarre. Defendants LaBarre vigorously resisted those efforts. For example, Defendants LaBarre requested hearings regarding funds garnished from Bank of America bank accounts, claiming that such funds were exempt monies. That opposition led to a garnishment hearing in this Court in June 2010, which, in November 2012, finally led to a stipulation that, in the end, resulted in the recovery of $6,213.77 for DIRECTV that was credited against the Judgment owed by Defendants LaBarre.

In the fall of 2010, DIRECTV also began proceedings to non-judicially foreclose on a deed of trust that Defendants LaBarre had given DIRECTV on commercial real estate located at 1030 South Mesa Drive, Mesa, Arizona 85210 (the "Mesa Property"). The Mesa Property trustee's sale originally was set for January 11, 2011.

Throughout fall 2010 and early 2011, Defendants LaBarre and their counsel continued to insist that the missed payment to DIRECTV would be forthcoming. The negotiations proved fruitless.

In early 2011, DIRECTV negotiated with Defendants

LaBarre and their counsel an amendment to the July 10, 2009 Settlement Agreement (the "Amendment"). The Amendment, which went through extended negotiations and multiple drafts, required Defendants LaBarre to pay $200,000 in three installments due March 16, 2011, April 1, 2011 and May 1, 2013. The first installment was to be in the amount of $43,786.23, funded by the sale of real estate located at the NE corner of 4th W. & Cleveland Street, St. Johns, Arizona 85936 (the "St. John's Property") that DIRECTV had encumbered with a judgment lien. The second installment was to be in the amount of $100,000, funded by a purported refinance of the Mesa Property. The third installment was to be in the amount of $50,000 evidenced by a Promissory Note, which was secured by real property located in Eagar, Arizona (the "Eagar Property") and 100,000,000 shares of B2Digital, Inc. stock. . . . ["Neither the St. Johns Property nor the Eagar Property was disclosed by Defendants LaBarre in the original Settlement Agreement."]

The St. Johns Property was liquidated and the sales proceeds ($35,000) plus a small payment from Defendants LaBarre ($8,786.23) were eventually paid to DIRECTV for a total recovery of $43,786.23. Defendants LaBarre, however, defaulted on their two remaining payments to DIRECTV. Moreover, Defendants LaBarre failed to deliver stock certificates required of Defendant Paul LaBarre as additional security. Defendants LaBarre again were in default of their settlement obligations.

In the Amendment, Defendants LaBarre also agreed to deliver to DIRECTV a condition of title report confirming, as represented by Defendant Paul LaBarre, the first lien priority of the Deed of Trust with respect to the Eagar Property to be recorded as part of the Amendment. Defendants LaBarre never delivered that title report and DIRECTV subsequently learned that the Eagar Property was, in fact, overencumbered by another lien that would render DIRECTV's Deed of Trust worthless. Because Defendants LaBarre defaulted on their Amendment obligations, DIRECTV does not have a Deed of Trust recorded against the Eagar Property. But, it does have a recorded Judgment lien against the previously-undisclosed— in violation of the representations they had made about their financial net worth in the July 10, 2009 Settlement Agreement—Eagar Property as a result of DIRECTV's recording of the Judgment in every county in Arizona. DIRECTV later learned that in yet another effort to hide and/or transfer assets, United Business Services (Defendant Terri Sue LaBarre's entity and a defendant in this action) recently quitclaimed the Eagar Property to an entity owned by Sterling Threet, at times a purported attorney for Defendants LaBarre and/or a likely business associate of Defendant Paul LaBarre.

Throughout summer and fall 2011, Defendants LaBarre and their counsel continued to promise payment to DIRECTV. Other than a one-time payment of $10,000 in June 2011, the

- 6 -

negotiations again proved fruitless.

In fall 2011, Defendant Paul LaBarre proposed to assign to DIRECTV a $300,000 state court judgment he held against two businesses owned by Atonn Mohammad. That assignment was completed on October 13, 2011. . . .

As had been DIRECTV's experience since 2009, efforts to collect on the assigned judgment, which included preparation and travel for a debtor's examination of Mr. Mohammad in Washington, D.C., proved fruitless. DIRECTV later learned that Mr. Mohammad was and continues to be a business associate of Defendant Paul LaBarre and is an officer in one of Defendant Paul LaBarre's companies.

In late 2011, DIRECTV identified a Cable Television Service and Easement Agreement from 1997 between a multi-unit property known as Meridian Manor (located in Apache Junction, Arizona) and an entity affiliated with Defendants LaBarre, Alpha Communications, Inc., also known as Alpha Broadcasting,("Alpha"). As late as December 2011, Meridian Manor was still making payments to Alpha at the Mesa Property address(i.e., to Defendant Paul LaBarre) for almost $10,000 a month. DIRECTV initiated a garnishment for the monthly payments, only to uncover another scheme in which Defendants LaBarre attempted to hide assets and/or avoid collection efforts. Specifically, Tamara Hunt, a known business associate of Defendants LaBarre and the mother of Defendants LaBarre's adopted children, intervened, stating that Alpha's contract—and its monthly fees—had been purportedly assigned to her in 2009, despite the fact that Defendant LaBarre was receiving and cashing the checks.

Defendants LaBarre also claimed to have secured financing from a third party, which they identified as Inter Global Investments. Defendants LaBarre provided to DIRECTV a supposed wire transfer in the amount of 150 million Euros that was to be used to pay off their obligations to DIRECTV. The document received from Defendants LaBarre . . . appeared highly irregular and of doubtful legitimacy. The transaction went nowhere.

In mid-2012, DIRECTV received a proposed offer by a third party called Cold River Capital that purportedly wanted to buy for $70,000 the Judgment against a company owned by Defendant Paul LaBarre, B2Digital, Inc. DIRECTV drafted and executed a Purchase and Sale Agreement with Cold River Capital. That agreement included DIRECTV's promise to credit the $70,000 payment against the Judgment owed by Defendants LaBarre. . . .

Cold River Capital immediately defaulted on the promised $70,000 payment. Phil Sands, the owner of Cold River Capital, later admitted that he had been "duped" by Defendant Paul LaBarre in entering into the failed transaction. Defendants LaBarre had provided an email

- 7 -

regarding this transaction, purportedly from an IPO underwriter, to Mr. Sands. When inquiring to that underwriter about the transaction, DIRECTV learned that the underwriter was completely unaware of the transaction, and never wrote the email. The email provided by Defendants LaBarre had been completely fabricated. DIRECTV made a demand for $11,400.61 in legal expenses related to the phony transaction. No payment was received from Cold River Capital.

Skeptical of further negotiations with Defendants LaBarre, DIRECTV engaged in its own investigation as well as third-party discovery in aid of execution as authorized by Federal Rule of Civil Procedure 69. That discovery led to DIRECTV's identification of two additional assets that Defendants LaBarre had failed to disclose, in violation of the representations they had made about their financial net worth in the July 10, 2009 Settlement Agreement. . . .

The first asset DIRECTV located was a deed of trust evidencing a $50,000 promissory note executed by Francisco and Marla Saldana (the "Saldanas") in favor of Defendants LaBarre, which was secured by real property in Casa Grande, Arizona. The second asset DIRECTV located was a Deed of Trust evidencing a $30,400 promissory note executed by Harold and Donna Swanson (the "Swansons") in favor of Defendants LaBarre, which was secured by a mobile home in Casa Grande, Arizona. Neither asset had been disclosed by Defendants LaBarre despite their representation and warranty in the July 10, 2009 Settlement Agreement.

DIRECTV served writs of garnishment on the Saldanas and the Swansons. The Swansons' Answer stated that the mobile home was paid in full in March 2012— meaning it still existed for two-and-a-half years after Defendants LaBarre made their representation and warranty regarding their assets in the July 10, 2009 Settlement Agreement. The Saldanas' Answer noted that the Saldanas were still making payments in the amount of $585 a month to Defendants LaBarre.

Defendants LaBarre objected to the Saldana garnishment. They contended that they were not timely notified of the garnishment, despite the fact that they were still represented by an attorney of record who continued to appear as counsel—Gregory Robinson—in this action. Defendants LaBarre produced a never-before-seen assignment of promissory note, which purportedly assigned the Saldana note to their minor son, Dante, for his "gym fees." DIRECTV sent out discovery requests to Defendants LaBarre, and subpoenaed third parties. Defendants LaBarre characterized DIRECTV's lawful collection efforts as "continued harassment" and attempts to "steal money." Of course, Defendants LaBarre failed to respond to discovery served on them in August, and DIRECTV was forced to move to compel before it received their deficient responses in late November 2012, six days before the garnishment hearing.

> On December 6, 2012, DIRECTV and Defendants LaBarre appeared for a full evidentiary hearing, with examination of witnesses and presentation of evidence. Despite vigorous and constant opposition by Defendants LaBarre, the Court found in favor of DIRECTV on the Saldana garnishment. In the end, the Court rejected Defendants LaBarre's claim that the Saldana promissory note had been validly assigned to Defendants LaBarre's minor son to cover his "gym fees." . . .
>
> Despite Defendants LaBarre's opposition, to date, DIRECTV has collected $14,645 from the Saldana garnishment.
>
> Discovery by DIRECTV also led to the identification of a third asset not previously disclosed. The asset consists of real property owned by Defendant Terri Sue LaBarre located at 148 Cedar Street, Central Point, Oregon 97502 (the "Oregon Property"). The Oregon Property, which is unencumbered, is estimated to be worth approximately $100,000. The Oregon Property had not been disclosed by Defendants LaBarre despite their representation and warranty in the July 10, 2009 Settlement Agreement.
>
> Upon learning of the asset, DIRECTV registered its judgment in Jackson County, Oregon, engaged Oregon local counsel . . . , and initiated proceedings to foreclose on its judgment lien by means of a sheriff's sale. . . .
>
> Defendants LaBarre vigorously opposed the sheriff's sale by filing multiple motions (seven motions to date) and producing two different deeds of trust that purport to transfer the Oregon Property from Defendant Terri Sue LaBarre to her adult daughter. Though the deeds purport to have been signed in 2010, neither deed was filed with Jackson County prior to November 13, 2012, when DIRECTV registered its judgment against Defendants LaBarre.
>
> In response to these efforts to block the sheriff's sale, DIRECTV filed an action against Defendant Terri Sue LaBarre seeking (a) a judicial declaration that DIRECTV's judgment lien was superior to the later filed deed of trust, and (b) damages for fraudulent conveyance and fraud. . . . Before the Oregon state court could rule on DIRECTV's claims, Defendants LaBarre filed a petition for bankruptcy protection, thereby staying the court proceedings.
>
> In December 2012, DIRECTV began attempting to serve subpoenas for judgment debtor examinations and *duces tecum* on Defendants LaBarre in an effort to learn of other undisclosed assets. But, Defendants LaBarre once again thwarted collection efforts by proving extremely difficult to serve. For example, in late January, after almost a month-and-a-half of not being able to serve them, Defendant Paul LaBarre agreed on a location, date, and time for service. Yet, despite that agreement, Defendant Paul LaBarre did not show. The process server, based on the facts and circumstances available to her at the location of service, believed

Defendants LaBarre were attempting to avoid service.

In February 2013, DIRECTV finally was able to serve Defendant Paul LaBarre with the subpoenas, but not Defendant Terri Sue LaBarre. Defendant Paul LaBarre advised the process server that, "Terri is not available and will never be available." In order to effect service on Defendant Terri Sue LaBarre, DIRECTV's process server had to track her down while she was attending a gymnastics meet in Tucson, Arizona.

Despite the effort it took to serve the subpoenas on Defendants LaBarre, they continually refused to respond to document production requests and/or appear at debtor exam deposition dates. Around this time, Defendant Terri Sue LaBarre began asserting a medical issue and produced a doctor's note stating she could not participate in any court proceedings. To this day, Defendant Terri Sue LaBarre refuses to show up for any hearing, deposition, or court proceeding. Further, despite being served with those subpoenas over a year ago, Defendants LaBarre have never responded to them.

In late 2013, the first position lienholder on the Mesa Property began to move forward with trustee's sale proceedings. DIRECTV's counsel again began fielding potential, but likely illegitimate, "offers" from Defendants LaBarre regarding the sale of the Mesa Property. None of these "offers" ever proved legitimate. On the day the first position lienholder's trustee's sale was set to go forward, Defendants LaBarre filed bankruptcy.

Despite vigorous opposite by Defendants LaBarre, which has included bad-faith respresentations of potential settlement positions; filing frivolous motions; refusing to comply with discovery, subpoenas, and other court orders; and producing questionable assignments, deeds of trust and other financial documents, DIRECTV successfully has recovered $74,645 from Defendants LaBarre, as follows:

    (a)    $6,213.77 from the 2010 bank garnishments;

    (b)    $35,000 from sale of the St. Johns, Arizona property that was a subject of the March 2011 Settlement Amendment;

    (c)    $8,786.23 paid by Defendants LaBarre as part of the March 2011 Settlement Agreement;

    (d)    $10,000 paid by Defendants LaBarre in June 2011 in return for DIRECTV's agreement to cancel a trustee's sale of a the [sic] Mesa Property; and

    (e)    $14,645 from garnishment of the Saldana promissory note, as ordered by the Court on January 13, 2013.

> I, as well as local counsel, repeatedly warned Defendants LaBarre and their counsel that DIRECTV intended to seek an award of its legal expenses under the July 10, 2009 Settlement agreement. Nevertheless, Defendants LaBarre persisted with their obstructionist behavior in response to lawful collection efforts by DIRECTV. The high legal expenses incurred by DIRECTV are in direct response to, and a consequence of, the actions taken by Defendants LaBarre.

(Doc. 200-5 at 4-13) (citations, footnotes, and paragraph numbering omitted).

The LaBarres offer no controverting evidence.[1] Thus, the Court assumes the foregoing evidence to be undisputed for purposes of deciding the present motion.[2] Considering the LaBarres' actions, the fact that DIRECTV has incurred attorneys' fees significantly in excess of the present balance on the LaBarres' debt to DIRECTV is neither surprising nor unreasonable. This is particularly so considering that the original debt under the Settlement Agreement was $400,000 and the present balance has been substantially reduced only as a result of DIRECTV's collection efforts. The claimed fees are not unreasonable on their face.

**B.      Tasks Unrelated to Enforcement of the Settlement Agreement Against the LaBarres**

The LaBarres next argue that they are not obligated to reimburse DIRECTV for attorneys' fees DIRECTV incurred in collecting from the other Defendants or from third parties because these fees are not related to the enforcement of the Settlement Agreement against the LaBarres. (Doc. 201 at 3). But the terms of the Settlement Agreement specifically provided that "in the event of any breach or violation by the Settling Defendants, *or any one of them*, of the Settlement Agreement . . . . DIRECTV shall be entitled to recover its actual expenses associated with the enforcement of this Settlement

---

[1] The LaBarres object to DIRECTV's statement that they failed to deliver stock certificates to DIRECTV. (Doc. 201 at 2). They assert that "DIRECTV's own documents reveal that he assigned 100,000,000 shares . . . to DIRECTV." (*Id.*) Although the LaBarres offer no controverting evidence, only argument, the Court notes that an assignment of shares is not the same as delivery of a stock certificate.

[2] The LaBarres assert that DIRECTV's facts are "inaccurate" and "designed to make the LaBarres look like evasive schemers." (Doc. 201 at 2). The Court considers these facts solely for their legal significance as uncontroverted.

- 11 -

Agreement . . . ." (Doc. 200-5 at 78).

Thus, the LaBarres' objections to two time entries concerning both Paul LaBarre and Ernest McKay are without merit. *See* (Doc. 201 at 3-4). The LaBarres' objections to thirty-eight time entries involving a proposed transaction between DIRECTV and Cold River Capital fail for two reasons. First, the LaBarres fail to specifically identify the entries to which they object. The Court will not search DIRECTV's time entries in an attempt to identify the thirty-eight time entries to which the LaBarres object; the Local Rules require the LaBarres to "separately identify each and every disputed time entry." LRCiv 54.2(f); *see also Peterson v. Fed. Express Corp. Long Term Disability Plan*, 525 F. Supp. 2d 1125, 1129 (D. Ariz. Nov. 26, 2007) ("The court is not required to review extensive time entries to analyze which are excessive when the objecting party has not done so." (citing LRCiv 54.2(f))). Second, under the terms of the Settlement Agreement, the LaBarres are obligated to reimburse DIRECTV for "actual expenses associated with the enforcement of the Settlement Agreement." Expenses incurred in collecting on the LaBarres' debt after their breach of the Settlement Agreement are expenses associated with the enforcement of that agreement. The fact that DIRECTV's collection efforts involved third parties does not negate this association because any monies collected were used to reduce the LaBarres' debt to DIRECTV.

For both of these same reasons, the LaBarres' objections to fifty-four unidentified time entries involving collection against Atonn Mohammad and to 116 unidentified time entries involving Francisco and Marla Saldana are also without merit. *See* (Doc. 201 at 5).

Similarly, the LaBarres object to seventy-nine unidentified time entries relating to DIRECTV's efforts to garnish Meridian Manor, a multi-unit property with connections to the LaBarres, as well as fifty-eight entries relating to collection efforts involving a "T. Hunt" who apparently purchased Meridian Manor from Ernest McKay. (*Id.* at 6). The LaBarres assert that DIRECTV's withdrawal of its writ of garnishment against Meridian Manor shows that "DIRECTV itself recognized the unlawfulness of its garnishment and

dropped further collection efforts as to Meridian Manor." (*Id.*) But the LaBarres offer no evidence other than DIRECTV's summary withdrawal of its writ, (Doc. 201-1 at 12), and their argument is therefore unpersuasive.

### C. DIRECTV's Alleged Interference with the LaBarres' Repayment

The LaBarres also allege that DIRECTV has repeatedly interfered with their attempts to pay their debt. (Doc. 201 at 7). They assert that they had arranged for a third party to purchase a portion of their debt and to pay DIRECTV $70,000 but counsel for DIRECTV contacted the funding source and caused the deal to be cancelled. (*Id.* at 7-8). In a second instance, the LaBarres allege that they had obtained refinancing for their home but the transaction fell through after DIRECTV informed the original lienholder that it and the LaBarres had not agreed upon an amount to settle the LaBarres' debt. (*Id.* at 8). The LaBarres fail, however, to offer any actual evidence of these events other than counsel's contentions in opposition to DIRECTV's motion. *See Coverdell v. Dep't of Soc. & Health Servs., State of Wash.*, 834 F.2d 758, 762 (9th Cir. 1987) (counsel's assertions are not controverting evidence). Accordingly, they fail to show why DIRECTV's entitlement to fees should be precluded on this basis.

### D. Reasonableness of Claimed Fees

Because the LaBarres fail to contest the reasonableness of DIRECTV's claimed fees except as previously mentioned, and the Court finds the LaBarres' attacks of the claimed fees to be without merit, the Court will award DIRECTV the reasonable attorneys' fees and costs claimed in its motion. The Court has independently reviewed the supporting documentation attached to DIRECTV's motion and is satisfied that these fees were reasonable and were incurred in connection with the enforcement of the Settlement Agreement. The LaBarres are therefore contractually obligated to pay them. Furthermore, based on the terms of the Settlement Agreement, this obligation is joint and several.

### IV. Conclusion

For the foregoing reasons,

**IT IS ORDERED** granting DIRECTV's Motion for Award of Attorneys' Fees

1 and Related Non-Taxable Expenses (Doc. 200).

2 **IT IS FURTHER ORDERED** awarding DIRECTV $437,079.86 in attorneys'
3 fees and non-taxable costs against Paul LaBarre and Terri LaBarre, jointly and severally.

4 Dated this 30th day of October, 2014.

James A. Teilborg
Senior United States District Judge